### In re SCREWS ANTITRUST LITIGATION.

#### No. M.D.L. 443.

United States District Court,
D. Massachusetts.

July 15, 1981.

Stephen Moulton, Moulton & Looney, Boston, Mass., for plaintiffs.

Robert M. Buchanan, Sullivan & Worcester, Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Chief Judge.

The plaintiffs are before the Court seeking class certification in twenty actions consolidated in this District for pretrial proceedings by the Judicial Panel on Multidistrict Litigation (28 U.S.C. § 1407). They claim that the five defendants are liable under Section 4 of the Clayton Act, 15 U.S.C. § 15, for a Sherman Act Section 1 price-fixing violation, 15 U.S.C. § 1. The plaintiffs demand injunctive relief (15 U.S.C. § 26), as well as treble damages, attorneys' fees, and costs.

■ It is basic law that Clayton Act § 4 treble damage recovery requires the plaintiff to prove a violation of the antitrust laws, some adverse economic impact from the violation, and some evidence of the amount of damage. *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir. 1978). The decisive issue on this motion is whether or not the plaintiffs can establish that proof of the second element, the fact of damage to proposed class members, may proceed on a common and generalized basis. Should the plaintiffs succeed a class may well be appropriate under Rule 23(b)(3) Fed.R.Civ.P., on the grounds, among others, that common questions of law or fact predominate over questions affecting only individual plaintiffs. *In Re Glassine and Greaseproof Paper Antitrust Litigation*, 88 F.R.D. 302 (E.D.Pa.1980). If the plaintiffs fail to make that showing, class certification should be denied. Courts have differed in their application of the legal principle that impact should be capable of common proof to facilitate use of a Rule 23(b)(3) class. *Compare Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Hedges Enterprises, Inc. v. Continental Group*, 81 F.R.D. 461, 474 (E.D.Pa.1979); *In Re Corrugated Container Antitrust Litigation*, 80 F.R.D. 244 (S.D. Texas, 1978). The varying results reflect more the factual differences in the cases, the different products, markets, and pricing structures, than any dispute over legal theory. *Windham, supra* at 68; *Blue Bird Body Co., Inc., supra* at 316. Moreover, the Advisory Committee Notes on Rule 23(b)(3) emphasize, in an admonition applicable to the four conjunctive requirements of Rule 23(a) as well as to the mandatory findings of predominance and superiority pertinent to Rule 23(b)(3), that the decision to certify a class turns "upon the particular facts" of a given case.

### I. The Fastener Industry and Standard Screws

This case focuses on behavior in the fastener industry, more particularly the practices of five screw manufacturers over a twenty year period. Screws are fastener components used in a range of applications, from the most sophisticated automotive and aerospace assemblies to the most ordinary consumer household fixtures. They are primarily a steel product, produced with minimal fabrication, usually cold forging with the smaller sizes, and finished with secondary operations that vary dimensions and plating.

All parties agree that the claims in this litigation relate only to the pricing of standard screws, yet the definition of standard screws has proven elusive. In the criminal case brought last year, *United States v.*

*Amtel, Inc., et al*, Cr. 80–244 (D.Mass.1980), the indictment defined standard screws as screws that "are common in the trade and . . . usually produced to a standardized, published specification. They are distinguished from special screws which often must be produced from a blueprint supplied by the customer." The indictment also alleged that standard screws are usually divided into three categories called wood, machine and tapping screws.

Wood screws are tapered to a point and are typically threaded for only part of their length. Machine screws are not tapered and are threaded for their entire length. They must be put into pre-drilled holes having threads compatible with the screw and are sometimes held in place with a nut. Tapping screws, which include sheet metal screws, are tapered and usually threaded for their entire length. Their main feature is that they cut their own threads in the metal or other material into which they are driven. They are sometimes called 'self-tapping' screws because they eliminate the need to 'tap' or thread a compatible hole.

Both testimony at the criminal trial and recent submissions in these civil cases reveal, however, that the distinction between "standards" and "specials" is not a clear one, and that "standard screw" is a relative term.[1] It is so relative in fact, that defendants now tell the Court that some standards are not standards but specials, and plaintiffs counter that some specials are not specials but standards.[2]

All of this verifies that labels are of little assistance in addressing substance. This is a price-fixing conspiracy case against five defendants and what is decisive is not what the fastener industry generally termed as standard screws, nor even what any partic-

ular firm viewed as standards, but what two or more of the defendant manufacturers considered to be standard screws. The defendants' own submission from the Industrial Fasteners Institute emphasizes the importance of the contextual definition. "Nomenclature is often a serious problem both to the manufacturer and the user of fastener products. A product that may be referred to as a standard by one manufacturer or user, might be completely special to another." (Exh. A Bancroft Affidavit). Having presided at the criminal trial and reviewed submissions in these civil cases, I conclude for the purposes of this motion that a standard screw is what two or more of the defendants considered to be standard. Marketing appears to be the most determinative factor in evaluating whether or not companies viewed screws as standards. If a screw was an inventory item, that might be one factor. Whether or not it met all national specifications might be another. But if a manufacturer was willing to put a screw on a published price list, with published discount sheets, or employ a net price list, for the sale of a screw to a purchaser, even assuming use of some additional unpublished discounts, this Court is satisfied for the tentative purpose of class certification that the listed screw is a standard. Products sold exclusively on application are outside the scope of "standard screws."

It is not uncommon for a manufacturer to patent a particular kind of screw and yet license other competing manufacturers to produce and market the same item. Such proprietary screws are within the above definition to the extent that they appear on the printed price sheets of two or more of the defendants.

---

1. The personal defendant at the criminal trial testified that wood screws may be manufactured as special screws. (*United States v. Amtel, supra*, Tr. 7–67–68). In addition, he stated: "Identifying standards and specials, you get into a very fine line in the middle." (Tr. 7–38). One other witness at the trial testified that his company made "a standard product that's quite unique, even though it's a standard product . . ." (Tr. 6–169).

2. The plaintiffs proposed definition of standard screws is: standard screws include all screws for which printed price lists or discount lists were issued, including proprietary screws sold pursuant to such lists or schedules.

The defendants contend that a standard screw is one that can be referenced from nationally recognized specifications and produced by any interested manufacturing facility.

## II. *Marketing Standard Screws*

The criminal indictment that preceded these civil cases charged the defendants and their co-conspirators with fixing the price of standard screws "sold to distributors." *United States v. Amtel, Inc. et al., supra.* The plaintiffs third amended unified and consolidated complaint is not limited to distributor purchasers. ¶ 16.

Several types of distributors buy standard screws. Some distributors deal almost exclusively in the wholesale hardware trade, buying standard screws, often packaged, for resale to retail hardware stores. Some of these distributors may be merely buying organizations, buying standard screws solely for resale to member stores.

More general distributors also trade in the standard screw marketplace. Such entities purchase fasteners from any source, including imports, for resale, often in bulk, to any buyer, including manufacturers who will use the screws in the assembly of their own products. Some distributors also specialize as industrial mill supply houses, purchasing standard screws for resale, largely packaged, to factories and the like for their own maintenance and internal uses.

During the relevant period for this complaint, 1957–1977, most distributors purchased standard screws by negotiating prices from published price lists and discount sheets, or net price lists, with the addition of unpublished discounts, referred to as "terminals" or "tens." The plaintiffs assert that the defendants and their co-conspirators agreed, by means of off-the-record meetings of the United States Wood Screw Service Bureau, on an inflated price structure for the list and discount figures, which stabilized or maintained a supracompetitive price for standard screws, even allowing for varying transactional prices based on unpublished discounts. The defendants contend that this complex pricing structure, highlighted by unpublished "terminals" and competitive imports, divorced transactional prices from the published price sheets.

Aside from distributor pricing, affidavits submitted by the parties, as well as trial testimony in the criminal case, suggest that product manufacturers who purchased screws directly from the defendants for use in the assembly of market products, such as automotive companies and major appliance manufacturers, negotiated prices in a substantially different manner than distributors during the time period of the complaint. Such purchasers, Original Equipment Manufacturers (OEM), often invited competitive bids on any standard screw order, forcing defendant manufacturers to cost each order and bid for the sale, leaving the customer free to accept or reject the bid or enter into additional negotiations. Several of the defendant companies had entirely different sales forces to process OEM "application" marketing and there is almost no evidence in the record correlating list and discount prices on standards to OEM prices for the same item, even allowing for the fact that OEMs often bought standards in bulk while distributors frequently purchased "packaged" screws.

## III. *Rule 23(a) Prerequisites*

Class certification turns on plaintiffs demonstrating that the four prerequisites of Rule 23(a) Fed.R.Civ.P. are satisfied, and the Court ruling that a class under one of the Rule 23(b) subsections is appropriate. In these cases none of the Rule 23(a) prerequisites is seriously contested by the defendants. A class of standard screw purchasers, even if narrowly defined, is clearly "so numerous that joinder of all members is impracticable." Rule 23(a)(1). The parties suggest that a class of distributors would involve roughly 6,000 potential class members, whereas a class including OEM purchasers would approach 155,000 class members. Exact figures, of course, are not needed to satisfy Rule 23(a)(1). *In Re Glassine and Greaseproof Paper Antitrust Litigation, supra.* The plaintiffs allege that the defendants engaged in a conspiracy to raise, fix, maintain and stabilize the prices of standard screws. Certainly whether such a conspiracy existed, and if so, the means and success of defendants in fraudulently concealing the agreement, and probably the impact of the conspiracy, are questions of law or fact common to pur-

chasers of standard screws. Rule 23(a)(2). *In Re Sugar Industry Antitrust Litigation,* 73 F.R.D. 322, 335 (E.D.Pa.1976); *State of Minnesota v. United States Steel Corp.,* 44 F.R.D. 559 (D.Minn.1968).

The typicality of the claims of the representative parties is also evident, even conceding that the quantities of screws purchased by the representatives may vary widely. Rule 23(a)(3) does not require perfect identity, "but merely that the claims be based on the same legal or remedial theory" and that no conflicting interests appear between representatives and absentee class members. *In Re Corrugated Container Antitrust Litigation, supra* at 248. Each representative and absentee class member must rely on the elements of conspiracy, impact, damage and fraudulent concealment to recover under the Clayton Act for the period alleged in the complaint, and mere disparity in damage awards will not destroy the typicality demonstrated here. *In Re Glassine and Greaseproof Antitrust Litigation, supra.*

To the extent that defendants contest any of the Rule 23(a) prerequisites, they question whether or not certain representatives "will fairly and adequately protect the interests of the class." Rule 23(a)(4). The defendants take issue with the presence of Jefferson Screw and Bolt, Square D Company and Benoit, Inc. as representatives. Although Jefferson may have bought some imported standard screws and sold in competition with defendant manufacturers, Jefferson did not compete with defendants as a manufacturer, and to the extent Jefferson purchased standards from the defendants as a distributor it may have suffered damage from any allegedly inflated price structure, just as any other distributor who bought from defendants but may have resold only in markets where the defendants did not sell directly, i. e. hardware trade.

Any involvement that Square D Company had with antitrust violations, the ground on which defendants contest its adequacy as a representative, is not significant in the present context, both due to the passage of time and the lack of any factual support linking present management, i. e. officers and directors, to any alleged wrongdoing. Finally, defendants' claim that Benoit, Inc. is an inadequate representative because it made no purchases from the defendants is contested by plaintiffs who assert that Benoit purchased screws directly from Textron, Inc. Benoit will be retained as a representative party pending resolution of that factual dispute. I rule that the plaintiffs have met the four prerequisites of Rule 23(a).

### IV. *Rule 23(b)(3) Findings*

The plaintiffs seek establishment of a class under Rule 23(b)(3) Fed.R.Civ.P. and such a certification is dependent on the Court finding that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). Proving the existence of a standard screw price-fixing conspiracy in the U. S. Wood Screw Service Bureau is a question common to all class members, while the issue of specific recovery for any alleged wrongdoing is necessarily a more individualized inquiry. Whether proof of impact and causation may proceed on a common basis or not is a more difficult issue on these facts. The defendants linked at times, in both oral argument and in briefs, the issue of proving fact of damage with the problem of establishing quantum of damage. The two questions are, of course, quite distinct.[3] "If common proof demonstrates some damage to each member of the class," causation "may be demonstrated on a class-wide basis," *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3rd Cir. 1977) *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), notwithstanding that the amount of damage to each

---

**3.** Professor Areeda observes that courts "will insist upon a greater degree of proof of the fact of injury than would suffice for proof of the quantum of damage." 89 *Harv.L.Rev.* 1128 (1976). It is equally basic that the nature of proof offered to establish the fact of damage may be different in kind from the proof needed to approximate individual injury.

plaintiff class member remains uncertain. The plaintiffs must, however, make a threshold showing "that what proof they will offer will be sufficiently generalized in nature that even as to the impact issue the class action device will provide a tremendous savings in time and effort to the judiciary and to the parties." *In Re Corrugated Container Antitrust Litigation, supra* at 252. Without trenching on the merits, the Court must evaluate whether the plaintiffs have met the threshold for a class of screw purchasers.

Defendants contend that product diversity and complex pricing preclude generalized proof of impact, while plaintiffs emphasize that this is a conspiracy case with a fungible steel product and a national market. Generalized proof of impact is certainly more likely where there is "some uniformity in the quality and price" of a product. *Blue Bird Body, supra* at 327–8. In *In Re Master Key Antitrust Litigation*, 70 F.R.D. 23 (D.Conn.1975), *appeal dismissed*, 528 F.2d 5 (2nd Cir. 1975), the product was builder's hardware, i. e. lock and key systems designed specifically for a particular building. The Court had no difficulty rejecting the defendants' argument that proof of impact was an individualized inquiry:

> If the plaintiffs introduce proof at the liability stage that they bought master key systems and that the defendants engaged in a pervasive nationwide course of action that had the effect of stabilizing prices at supracompetitive levels, the jury may conclude that the defendants' conduct caused injury to each plaintiff. *In Re Master Key Antitrust Litigation, supra* at 26 n. 3.

The flue-cured tobacco at stake in *Windham, supra,* a nonfungible product that has 161 government quality grades and 11 geographic markets in South Carolina alone, is dramatically different from lock and key systems, or standard screws. The defendants' effort to show the diversity of the standard screw product, even given the rather broad working definition above, is not persuasive. Screws are not inherently diverse, and distinctions offered are likely to be "surface distinctions" which should not deter class certification. *Shelter Realty Corp. v. Allied Maintenance Corp.,* 75 F.R.D. 34 (S.D.N.Y.1977).

Proof of the impact of the alleged Wood Screw Bureau conspiracy may proceed with a "common thread of evidence," *In Re Sugar Industry Antitrust Litigation, supra* at 345, including testimony by executives present at Bureau meetings, evidence as to pricing practices in the industry, introduction of list and discount sheets correlated with Bureau meetings, and testimony as to the national market, or at least as to eastern and western markets.

The common thread of evidence ends, however, with proof of impact to distributors. If defendants' arguments are less than persuasive within the context of list and discount pricing to distributors of all kinds, they acquire more force when examining pricing in the OEM market. Like the boy who cried "wolf" defendants in antitrust cases raise the diversified product and individualized pricing banner so often, see *In Re Glassine and Greaseproof Paper Antitrust Litigation, supra* at 306, that it becomes easy to overlook the meritorious applications of that principle. Testimony throughout the criminal case,[4] and affidavits submitted with this motion support the basic distinction between OEM and distributor pricing. Automotive companies purchase large volumes of standard screws, but industry practice is to price OEMs on application, not by list and discount sheets. Proving that OEM purchasers suffered some damage from allegedly supracompetitive standard screw list prices would require scrutiny of transaction after transaction for individual plaintiffs, and raise more questions particular to each plaintiff than general to the class. *Nichols v. Mobile County Bd. of Realtors,* 1980–81 Trade Cos. ¶ 63,688 at 77,692 (S.D.Ala.1980).[5]

---

**4.** E. g., *United States v. Amtel, supra,* Tr. 5–38, 6–168.

**5.** Defendants offer some empirical data purporting to show that transactional prices even to distributors were divorced from list and dis-

The defendants also rely on *In Re Electric Weld Steel Tubing Antitrust Litigation*, 1980–81 Trade Cos. ¶ 63,783 at 73,181 (E.D. Pa.1980), for the proposition that no trier of fact may presume that fact of damage is a question common to all class members and subject to general proof, even in a price-fixing conspiracy case such as this, where the conspirators lack market control.[6] The analysis is tempting, focusing as it does on the elemental difference between a Sherman Act § 1 violation, where market power or effect need not be established, and Clayton Act § 4 recovery which requires proof of injury to business or property. The Court is not persuaded on the facts of these cases that this analysis should be adopted herein.

Defendants assert that standard screw purchases are 14.9% of all industrial fastener sales and that their sales represented only 13.2% of total standard screw sales. In addition to being unconcentrated the defendants contend that the industry is a competitive one, with easy entry and imports restraining any oligopolistic development and preventing market control. Despite those assertions, executives that attended Bureau meetings testified to their success in raising prices.[7] In addition, plaintiffs point out that the seven Wood Screw Bureau members accounted for 90% of domestic wood screw production in 1975. Some of the present market figures may well be skewed because imports have risen significantly since 1969, while the conspiracy allegedly began in 1957, and because "garage operators" are not uncommon in the industry, but wholly unable to compete with the defendants.[8]

■ Having satisfied itself that the fact of damage may be proven as a common question of fact for a plaintiff class of distributors that purchased standard screws, the Court finds that common questions of law or fact predominate over questions affecting only individual members of such a class. *Rental Car of N. H. v. Westinghouse Elec. Corp.*, 496 F.Supp. 373, 382 (D.Mass.1980). In addition to the impact issue, the other common questions are: 1) the existence of the conspiracy; and 2) the means and success of fraudulent concealment. Quantum of damages and due diligence by the plaintiffs remain as individual issues, which do not, at least as of this tentative certification, justify denying a class. *Bogosian, supra* at 456.

I also find that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Rule 23(b)(3) mentions four matters pertinent to this finding, only one of which, 23(b)(3)(D), is on point. Difficulties likely to be encountered in the management of this class action are, at this stage, mere predictions of unmanageability, and will not suffice to block certification. *Yaffe v. Powers*, 454 F.2d 1362, 1365 (1st Cir. 1975). Nor does any alternative to the class action appear to be superior, given a potential class of 6,000 with many small claimants. *Hedges Enterprises, Inc., supra* at 477.

The certification is conditional, pursuant to Rule 23(c) Fed.R.Civ.P., and may be altered or amended or revoked before the trial on the merits. The class consists of all distributors who purchased standard screws during the period January 1, 1957 through December 31, 1977. Standard screws include all screws for which printed price lists

count prices. The Court leaves that evidence to be weighed in a jury's evaluation of the merits, satisfied as it is now that the plaintiffs have made a threshold showing that impact to distributors can be proven on a common basis by general evidence. Whether it is or is not proven at trial is another question.

6. The court concluded:
"Where ninety-six percent of the manufacturers of electric weld steel tubing were presumably not setting their prices pursuant to

any price-fixing conspiracy, the effect of their competition on the conspirators leads to the conclusion that the conspirators would not have been able to sell their products at artificially inflated prices to all purchasers." *In Re Electric Weld Steel Tubing, supra* at 78, 186.

7. E. g., *United States v. Amtel, supra*, Tr. 2–77, 4–162, 5–38.

8. See *United States v. Amtel, supra*, Tr. 5–27.

or discount lists or net price lists were issued by two or more of the defendants, including proprietary screws sold pursuant to such lists or schedules.

Order accordingly.