**In re RELAFEN ANTITRUST LITIGATION.**

No. 01–12239–WGY.

United States District Court, D. Massachusetts.

Nov. 10, 2003.

William Alper, Cohen, Pontani, Lieberman & Pavane, New York City, Richard A. Arnold, Kenny, Nachwalter, Seymour, Arnold, Critchlow & Spector, PA, Miami, FL, Michael M. Buchman, Milbert, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Patrick E. Cafferty, Miller, Faucher and Cafferty, LLP, Ann Arbor, MI, Daniel E. Gustafson, Heins, Mills & Olson, P.L.C., Minneapolis, MN, Samuel D. Heins, Heins, Mills & Olson, Minneapolis, MN, Theodore M. Hess–Mahan, Shapiro, Haber & Urmy LLP, Boston, MA, Elizabeth J. Holland,

Kenyon & Kenyon, New York City, Michael J. Kane, Mager, White & Goldstein LLP, Jenkintown, PA, Theodore M. Leiverman, Spector, Roseman & Kodroff, Philadelphia, PA, Richard D. Margiano, Palmer & Dodge LLP, Boston, MA, James W. Matthews, Sherin and Lodgen LLP, Boston, MA, Robert J. Muldoon, Jr., Boston, MA, Edward Notargiacomo, Hagens Berman, Boston, MA, Joseph Opper, Garwin, Bronzaft, Gerstein & Fisher, New York City, Margaret H. Paget, Sherin & Lodgen, Boston, MA, David K. Park, Willkie, Farr & Gallagher, New York City, David Pastor, Gilman and Pastor, LLP, Saugus, MA, Douglas H. Patton, Dewsnup, King & Olsen, Salt Lake City, UT, Scott E. Perwin, Kenny, Nachwalter, Seymour, Arnold, Critchlow & Spector, Miami, FL, Glen DeValerio, Kathleen M. Donovan–Maher, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Ruth T. Dowling, Palmer & Dodge, LLP, Boston, MA, Mayme A. Holt–Brown, Percy, Smith, Foote & Gadel, LLP, Alexandria, LA, Steven J. Lee, Kenyon & Kenyon, New York City, Lester L. Levy, Wolf, Popper, Ross, Wolf & Jones, New York City, for Consolidated Plaintiffs.

Michael J. Boni, Kohn, Swift & Graf, Philadelphia, PA, Jacqueline E. Bryks, Cohen, Milstein, Hausfeld & Toll, New York City, Neill Clark, Berger & Montague, Philadelphia, PA, Eric Cramer, Berger & Montague, Philadelphia, PA, Robert N. Kaplan, Kaplan, Fox & Kilsheimer LLP, New York City, Richard J. Kilsheimer, Kaplan Fox & Kilsheimer LLP, New York City, Peter Kohn, Berger & Montague, Philadelphia, PA, Linda P. Nussbaum, Cohen, Milstein, Hausfeld & Toll, New York City, Bernard Persky, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York City, Nancy F. Gans, Moulton & Gans, PC, Boston, MA, for Plaintiffs.

Bernard J. Bonn, III, Abbey Gardy & Squitieri, New York City, George G. Gordon, Dechert LLP, Philadelphia, PA, Timothy C. Hester, Covington & Burling, Washington, DC, Kevin T. Kerns, Dechert LLP, Philadelphia, PA, for Defendants.

## MEMORANDUM

YOUNG, Chief Judge.

### I. INTRODUCTION

On October 29, 2003, this Court issued an order allowing the Direct Purchaser Plaintiffs' Motion for Class Certification [Doc. No. 119]. 10/29/03 Order, *In re Relafen Antitrust Litig.*, Master File No. 01–12239–WGY [Doc. No. 151]. This memorandum explains the reasoning behind the Court's decision.

### II. BACKGROUND

This case presents a consolidated action against SmithKline Beecham Corporation and GlaxoSmithKline PLC (collectively "SmithKline") for violations of the antitrust laws related to its patent for the chemical compound nabumetone, which it sells commercially as "Relafen." Parties who purchased Relafen directly from SmithKline during the complaint period ("direct purchasers" or the "direct purchaser plaintiffs") moved for class certification under Federal Rule of Civil Procedure 23(b)(3).[1]

#### A. Factual Background [2]

On December 13, 1983, SmithKline received U.S. Patent No. 4,420,639 (the "'639 patent") for the compound nabumetone, a non-steroidal anti-inflammatory drug. SmithKline commenced commercial sales of nabumetone under the brand name Relafen in February, 1992. In August, and December, 1997, Copley Pharmaceutical, Inc. ("Copley"), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA ("Teva"), and Eon Laboratories, Inc. ("Eon") sought approval from the Food and Drug Administration (the "FDA") to market generic nabumetone products. Upon commencement of

---

1. Parties who purchased Relafen from sources other than SmithKline ("end payors") have also moved for class certification. The end payors' motion will be addressed in a separate opinion.

2. Unless otherwise indicated, these facts are drawn from the Court's Memorandum and Order, issued October 1, 2003, which addressed the parties' motions based on the statute of limitations and the doctrine of collateral estoppel. *In re Relafen Antitrust Litig.*, 286 F.Supp.2d 56 (D.Mass.2003).

SmithKline's lawsuits to enforce its '639 patent, however, the FDA stayed approval of the generic drugs for thirty months. *Id.* at 4. On August 8, and December 24, 1998, the FDA issued tentative approval to Teva's and Eon's generic nabumetone products, but withheld final approval until the conclusion of the thirty-month stay period. That stay period terminated in May, 2000.

SmithKline filed the patent suits in question on October 27, 1997 (against Copley), November 13, 1997 (against Teva), and February 17, 1998 (against Eon). After a bench trial, Judge Lindsay of this district issued a sixty-seven-page opinion, which found, *inter alia*, that (1) claims 2 and 4 of the '639 patent were invalid as anticipated by prior art; and (2) the '639 patent was unenforceable because of SmithKline's inequitable conduct before the Patent Office. *In re '639 Patent Litig.*, 154 F.Supp.2d 157, 194–95 (D.Mass. 2001) (Lindsay, J.). On August 15, 2002, the Federal Circuit affirmed the district court's decision as to the validity of the '639 patent but did not reach the issue of inequitable conduct. *SmithKline Beecham Corp. v. Copley Pharm., Inc.*, 45 Fed.Appx. 915, 917 (Fed. Cir.2002) (unpublished opinion).

Essentially, the plaintiffs claim that but for SmithKline's wrongful filing of patent lawsuits, purchasers could have begun purchasing nabumetone in a competitive market—comprising both Relafen and its generic alternatives—as early as September, 1998. Because of the pending litigation, however, the generic alternatives did not become available until after the stay period terminated and SmithKline's patent was invalidated. Teva[3] began marketing its generic products in August, 2001, with Eon following suit in February, 2002.

## B.  Procedural Background

On December 26, 2002, direct purchasers of Relafen filed a consolidated class action complaint against SmithKline for violations of the federal antitrust laws. The lead direct purchaser plaintiff, Louisiana Wholesale

Drug Company, Inc.[4] ("Louisiana Wholesale"), alleged that by blocking market entry of lower-priced generic equivalents, SmithKline "forced all direct purchasers of Relafen to pay supracompetitive prices." Direct Purchaser Pls.' Mem. [Doc. No. 121] at 1. The proposed class of direct purchasers is defined as:

> All persons or entities in the United States or its territories who purchased Relafen directly from defendants at any time during the period of September 1, 1998 through December 31, 2002.

Direct Purchaser Pls.' Reply Br. [Doc. No. 138] at 26 (amending the original complaint period, which extended from "December 24, 1998 through the date on which the anti-competitive effects of defendant's conduct ceased"). The direct purchaser plaintiffs here moved for class certification under Federal Rule of Civil Procedure 23(b)(3). [Doc. No. 119].

## III.  DISCUSSION

### A.  Legal Standard

On a motion for class certification, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23." *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir.2003) (citing *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). This analysis should not involve a "preliminary hearing into the merits," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), but rather an inquiry into "whether the requirements of Rule 23 are met." *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 427 (5th Cir.1971). The moving party bears the burden of establishing the elements necessary for class certification: the four requirements of Rule 23(a) and one of the several requirements of Rule 23(b). *Smilow*, 323 F.3d at 38 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 325 (D.Mass.1997) (Saris, J.).

---

**3.** Teva acquired Copley (and its generic nabumetone products) in August, 1999.

**4.** Former lead plaintiff Meijer, Inc. withdrew as a representative of the class by notice dated July 10, 2003. Notice of Withdrawal of Meijer, Inc. as Class Representative [Doc. No. 92] at 1.

Rule 23(a) imposes four "threshold requirements" applicable to all class actions: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *Amchem*, 521 U.S. at 613, 117 S.Ct. 2231.

In addition to the requirements of Rule 23(a), the moving party must establish the elements of Rule 23(b)(1), (2), or (3). *Amchem*, 521 U.S. at 614, 117 S.Ct. 2231. The direct purchaser plaintiffs here sought certification under Rule 23(b)(3). Direct Purchaser Pls.' Mem. at 20. Rule 23(b)(3) permits a class action when common questions "predominate over any question affecting only individual members," and class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Matters "pertinent" to evaluating predominance and superiority include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). This list of pertinent factors is "nonexhaustive." *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231. The Court considered the elements of Rule 23(a) and 23(b)(3) in turn.

### B. Rule 23(a)

■ To succeed on a motion for class certification, the direct purchaser plaintiffs must first establish the elements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Amchem*, 521 U.S. at 613, 117 S.Ct. 2231. The proposed class of direct purchasers includes approximately six-ty members, more than the forty individuals generally found to establish numerosity. *See McAdams v. Massachusetts Mut. Life Ins. Co.*, 2002 WL 1067449, at *3 (D.Mass.2002) (Freedman, J.) (citing 5 Moore's Federal Practice § 23.22[3][a], at 23–63). In addition, while the direct purchaser plaintiffs have not yet identified all class members, their broadly drawn class definition—all persons or entities who purchased Relafen directly from SmithKline during a four-year period—suggests that members of the class, once identified, will be "so numerous and widely dispersed that joinder ... is impracticable." *Id.; see McIntosh v. Irwin Union Bank & Trust, Co.*, 215 F.R.D. 26, 34–35 (D.Mass. 2003) (finding numerosity based upon circumstantial evidence). Accordingly, the Court concluded that the direct purchaser plaintiffs established numerosity here.

■■ The commonality element requires that "resolution of the common questions affect all or a substantial number of the class members." *Duhaime v. John Hancock Mut. Life. Ins. Co.*, 177 F.R.D. 54, 63 (D.Mass. 1997) (O'Toole, J.) (quoting *Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir. 1986)). The factual questions common to the class members' claims include whether SmithKline engaged in the alleged anticompetitive conduct and whether and to what extent this conduct resulted in overcharges. *See* Direct Purchaser Pls.' Mem. at 8; *see also In re Buspirone Patent Litig.*, 210 F.R.D. 43, 57 (S.D.N.Y.2002) (concluding that common questions concerning the existence and scope of anticompetitive behavior and whether such behavior resulted in overcharges in the relevant market satisfied the commonality requirement). The legal questions common to the class members' claims include whether SmithKline's conduct violated Section 2 of the Sherman Act. *See* Direct Purchaser Pls.' Mem. at 13; *see also Buspirone*, 210 F.R.D. at 57. The Court concluded, on the basis of these common questions and the fulfillment of the more stringent predominance requirement discussed below, that the direct purchaser plaintiffs established commonality under Rule 23(a).

■ The direct purchaser plaintiffs may establish typicality by demonstrating that the

"named plaintiffs' claims arise from the same course of conduct that gave rise to the claims of the absent [class] members." *Duhaime*, 177 F.R.D. at 63 (alteration in original) (quoting *Burstein v. Applied Extrusion Techs., Inc.*, 153 F.R.D. 488, 491 (D.Mass.1994) (Collings, Mag.)) (internal quotation marks omitted). Louisiana Wholesale, lead direct purchaser plaintiff, bases its claims on the same "core pattern of alleged anti-competitive conduct" that gives rise to all class members' claims. Direct Purchaser Pls.' Mem. at 9. Accordingly, the claims of Louisiana Wholesale are typical of those asserted by other members of the class. *See Duhaime*, 177 F.R.D. at 63 ("Because the named plaintiffs were subjected to the same deceptive sales techniques allegedly used by John Hancock against other class members, their claims are typical of the class claims.").

The element of adequacy "has two parts[:] the moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985). With respect to the first element, Louisiana Wholesale asserts claims typical of those of the class, claiming similar injuries, suffered during the same period and arising from the same conduct. As such, the Court concluded that no conflicts presently exist. With respect to the second element, the firms acting as lead counsel have experience prosecuting numerous class actions, including *Buspirone*, *In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551 (S.D.Fla. 2001), and *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D.Mich.2001), each of which involved analogous claims of delayed marketing of generic drugs. Moreover, counsel has vigorously pursued the direct purchasers' present claims before this Court.

Having concluded that the direct purchaser plaintiffs established the four elements of Rule 23(a), the Court proceeded to consider the elements of Rule 23(b)(3). The Court begins the following discussion with predominance, the requirement that SmithKline most strongly contests.

## C. Rule 23(b)(3)

### 1. Predominance

Predominance under Rule 23(b)(3) does not require an entire universe of common issues, but rather "a sufficient constellation" of them. *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir.2000). The predominance inquiry accordingly involves an individualized, pragmatic evaluation of the relationship between and the relative significance of the common and individual issues. *See* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 (2d ed.).

The direct purchaser plaintiffs allege a "common course of conduct" having a "general effect on the market." 7B Wright, Miller & Kane, *supra*, § 1781 (concluding that "a class action also will be proper" under such circumstances). Specifically, the direct purchaser plaintiffs commonly assert that SmithKline's prosecution of sham patent lawsuits delayed the marketing of generic nabumetone, in turn delaying the ability of all direct purchasers to substitute purchases of Relafen with purchases of lower-priced generic nabumetone, pay lower prices for generic nabumetone in a competitive generics market, and obtain increased discounts on purchases of Relafen. Direct Purchaser Pls.' Mem. at 4, 13, 15–16. The direct purchaser plaintiffs propose to prove these common injuries using generalized evidence and methodologies. *Id.* at 15. They identify three primary sources of common evidence—governmental and academic studies, projections and analyses described in SmithKline's and its competitors' internal documents, and price and sales data for Relafen and its generic equivalents—which, as described in the declaration of Stephen W. Schondelmeyer, Ph.D. (the "Schondelmeyer Declaration"), demonstrate the significant cost savings associated with generic entry. *Id.* at 15–16.

SmithKline, however, challenges the plaintiffs' characterization of injury as a common issue, asserting that "each class member will

**344**

have to be examined to determine whether it was impacted by defendants' alleged conduct." Def.'s Opp'n to Direct Purchaser Pls.' Motion [Doc. No. 122] at 1. SmithKline accordingly urges the Court to reject the commonality and predominance analyses used in the Schondelmeyer Declaration and in certification orders issued in other antitrust cases.

### a. The Schondelmeyer Declaration

In support of their motion, the direct purchaser plaintiffs submit the Schondelmeyer Declaration, which concluded that "class-wide proof" could be used to demonstrate the existence of common injuries in the form of overcharges. Direct Purchaser Pls.' Mem. at 4. Schondelmeyer, a professor of pharmaceutical economics, explained that common evidence reveals the following characteristics of generic market entry: A generic drug typically enters the market at a price substantially below that of a branded drug. For this reason, the generic drug quickly captures a large market share. As other generic versions enter the market, prices of the generic drugs drop further, leading to a corresponding increase in their market share. To compensate, the manufacturer of the branded drug frequently increases its level of discounts and other price adjustments. *See* Direct Purchaser Pls.' Mem. at 16.

SmithKline argues that Schondelmeyer's analysis fails to consider three crucial factors. First, "in many instances, the generic manufacturers bypassed wholesalers and sold directly to those wholesalers' customers." Def.'s Opp'n to Direct Purchaser Pls.' Mot. at 11. SmithKline cites the declaration of Peter Greenhalgh, which explained that while the manufacturers of branded drugs "typically sell the majority of their products through pharmaceutical wholesalers," the manufacturers of generic drugs often "sell directly to retail stores, HMOs, hospitals, and other customers." *Id.* at 8, 15. SmithKline argues that in light of these "market realities," determining the economic harm suffered by the plaintiffs requires individual inquiries regarding the extent and effect of bypass experienced by each purchaser. *Id.* at 17.

▪ The direct purchaser plaintiffs, however, assert injuries in the form of overcharges, not economic harm. Direct Purchaser Pls.' Reply Br. at 4. Overcharges, the "difference between the actual price and the presumed competitive price multiplied by the quantity purchased," provide what the Supreme Court has long recognized as the principal measure of damages for plaintiffs injured as customers, rather than as competitors. *Cardizem,* 200 F.R.D. at 309 (citing *Chattanooga Foundry & Pipe Works v. Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906)). In *Hanover Shoe, Inc. v. United Shoe Mach.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Supreme Court declined to reduce the measure of purchasers' antitrust damages from overcharge to economic loss, reasoning that under such a rule, private enforcement actions "would often require additional long and complicated proceedings," and because of their reduced stakes, "would be substantially reduced in effectiveness." *Id.* at 493–94, 88 S.Ct. 2224. Consistent with the rule of *Hanover Shoe,* the direct purchaser plaintiffs here seek damages in the form of overcharges, rendering SmithKline's arguments regarding actual economic harm irrelevant.

▪ SmithKline next argues that Schondelmeyer "fails to account for . . . [d]irect evidence show[ing] that prices for Relafen increased after the introduction of generic nabumetone." Def.'s Opp'n to Direct Purchaser Pls.' Mot. at 11. The direct purchaser plaintiffs, citing a report by Jeffrey J. Leitzinger, Ph.D., assert that SmithKline's interpretation of the evidence fails to consider customer discounts and is therefore "simply wrong." Direct Purchaser Pls.' Reply Br. at 24. At the certification stage, it would be both "unwise and unfair" for the Court to decide this "material factual dispute." *Buspirone,* 210 F.R.D. at 56; *accord Cardizem,* 200 F.R.D. at 311 (stating that the certification stage of litigation is not the proper forum in which to resolve a factual dispute between experts). Rather, the Court considers only whether the evidence that the direct purchaser plaintiffs will offer in support of their interpretation "will be sufficiently generalized in nature." *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 697 (D.Minn.1995) (quoting *In re Screws Antitrust Litig.,* 91

F.R.D. 52, 57 (D.Mass.1981) (Caffrey, C.J.)) (alteration in original) (internal quotation marks omitted). The direct purchaser plaintiffs meet that burden here. They propose to offer common evidence to demonstrate common injury resulting from, *inter alia*, their delayed ability to obtain increased discounts on purchases of Relafen.

Finally, SmithKline challenges the Schondelmeyer Declaration for disregarding evidence indicating that "some class members made no purchases of a generic product." Def.'s Opp'n to Direct Purchaser Pls.' Mot. at 11. SmithKline argues that these class members, "who bought Relafen before and after the introduction of generic nabumetone," suffered no injury in light of "the simple fact that prices of Relafen increased after generic entry." *Id.* at 17 n. 8. The direct purchaser plaintiffs contest both the accuracy and the significance of SmithKline's assertions. Direct Purchaser Pls.' Reply Br. at 5–6.

As noted above, the direct purchaser plaintiffs contest the alleged increase in Relafen's prices, suggesting that this is not quite "the simple fact" that SmithKline submits. Direct Purchaser Pls.' Reply Br. at 24. Under the direct purchaser plaintiffs' theory of damages, net prices of Relafen decreased after generic entry as a result of increased discounts granted to compensate for the growing market share captured by generic alternatives. *Id.* Accordingly, even those members of the class who purchased Relafen exclusively suffered from a delayed ability to obtain increased discounts on their purchases. *But see Terazosin*, 203 F.R.D. at 557, 558 n. 11 (acknowledging, under analogous circumstances, "artificially high" prices for the branded drug, but excluding from the class of direct purchasers "specialty distributors and repackagers that did not purchase generic drugs"). In addition, under the "but-for" circumstances predicted by the direct purchaser plaintiffs, including earlier entry of multiple generic alternatives and an accompanying reduction in generic prices, additional class members might have been induced to purchase generic substitutes.

For these reasons, the Court concluded that common issues and evidence regarding liability and the existence of injury predominate over individual issues and evidence regarding the quantum of injury. *See Smilow*, 323 F.3d at 40 ("Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."); *Cardizem*, 200 F.R.D. at 307. Accordingly, at this early stage, the Court considered it appropriate to certify the class as currently defined while maintaining its authority later to amend the definition to exclude members who have not suffered injury because they would not have benefitted from reduced prices of Relafen or its generic equivalents. *See Falcon*, 457 U.S. at 160, 102 S.Ct. 2364 ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.").

#### b. Analogous Actions

SmithKline also urges the Court to reject the direct purchaser plaintiffs' arguments by analogy as inappropriate "short-cuts to certification." Def.'s Opp'n to Direct Purchaser Pls.' Mot. at 17. SmithKline first contends that the present action is distinguishable from other antitrust actions in which courts have presumed class-wide impact. *Id.* at 17–18. It is worth noting that even in actions based on alleged conspiracies to enforce tying arrangements, in which a presumption of class-wide impact is ordinarily deemed appropriate, several courts have noted that this presumption "does not convert a claim otherwise inappropriate for class treatment into one that may proceed as a class action." *Rental Car of N.H., Inc. v. Westinghouse Elec. Corp.*, 496 F.Supp. 373, 380 (D.Mass. 1980) (Murray, J.) (adopting the approach of these courts but noting a "split of authority on this issue"). Rather, "[the] plaintiff must go further and satisfy the court that common questions of proof of the tying arrangement will predominate." *Id.* Consistent with its duty to conduct a "rigorous analysis," the Court applied no presumption here, but rather assigned to the direct purchaser plaintiffs the analogous burden of demonstrating that common evidence of overcharges would predominate. The direct purchaser plaintiffs

have met that burden, establishing that general market effects would be proven through common evidence including governmental and academic studies, internal manufacturers' analyses, and actual market data. Direct Purchaser Pls.' Mem. at 15–16.

SmithKline also challenges the plaintiffs' analogies to *Buspirone, Terazosin,* and *Cardizem,* recent district court orders that certified classes of direct purchasers of branded drugs. Def.'s Opp'n to Direct Purchaser Pls.' Mot. at 19. SmithKline contends that "in each of the other drug cases, defendants argued that certification was inappropriate because, in essence, the ability of direct purchasers to pass on overcharges made them better off." *Id.* Here, however, SmithKline challenges the existence of injury not because the direct purchaser plaintiffs were able to "pass on" overcharges, but because certain plaintiffs, who would not have "purchased generic nabumetone, purchased less Relafen post-generic entry, and/or received discounts on Relafen," would not have suffered overcharges at all. *Id.*

As an initial matter, the Court emphasizes that no case, however directly analogous, would justify the "reflexive certification" that SmithKline argues against. *Id.* The Court considered the above cases to be persuasive only, and did so only after conducting an independent analysis of their facts and holdings. This analysis demonstrates that, contrary to SmithKline's assertions, the defendants in each of the above cases raised "no overcharge" arguments similar to those raised here. *See Buspirone,* 210 F.R.D. at 58 (characterizing the defense that direct purchasers of the branded drug "would have lost much of their marketshare" upon generic entry as inappropriate for consideration at the certification stage and inconsistent with *Hanover Shoe*); *Terazosin,* 203 F.R.D. at 558 (declining to consider at the class certification stage assertions that "some class members would not have switched a substantial portion of [their] purchases from branded ... to generic ..." and that the branded manufacturer "raised prices substantially after generic [entry]" (alterations in original) (internal quotation marks omitted)); *Cardizem,* 200 F.R.D. at 317 (concluding that the

defendant's "by-pass and offsetting benefits arguments relate to the quantum of damages; not the fact of injury"). Accordingly, disregarding these cases as having involved different defenses appeared unwarranted.

Because SmithKline's arguments did not alter the Court's initial conclusion that common questions predominate, the Court next considered superiority.

### 2. Superiority

■ As stated by the Supreme Court in *Amchem,* the requirement of superiority, like that of predominance, ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231 (quoting Advisory Committee's Note on Fed.R.Civ.P. 23) (alteration in original) (internal quotation marks omitted). With its focus on individuals' interests in conducting separate lawsuits, the superiority requirement appears directly to address the Advisory Committee's core concern with the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Id.* at 617, 117 S.Ct. 2231 (quoting Benjamin Kaplan, *A Prefatory Note,* 10 B.C. Ind. & Com. L.Rev. 497, 497 (1969)) (internal quotation marks omitted). Permitting this additional recourse to the courts "is not troublesome when the action is predicated on a statutory mandate that is designed to promote the private rectification of conduct thought undesirable or to effectuate some other expression of public policy." 7A Wright, Miller & Kane, *supra,* § 1779.

Under *Amchem,* a class action here appears to be the superior method of resolving the direct purchaser plaintiffs' claims. Given the predominance of common questions and evidence, it appears that resolution by class action would provide substantial savings in time, effort, and expense. *See* 7B Wright, Miller & Kane, *supra,* § 1781 ("Since antitrust actions typically present many complicated issues, the courts should utilize these [class action] provisions to settle the common

issues on a representational basis to avoid congesting the courts with separate actions requiring the repetitive adjudication of the same matters."). In addition, resolving the direct purchaser plaintiffs' claims in a single forum limits the possibility of inconsistent rulings regarding, for example, SmithKline's liability or the appropriate yardstick for its customers' damages. Resolution by class action would instead promote uniform treatment of class members—similarly situated direct purchasers who allege similar injuries resulting from the same conduct.

■■■ Regarding the first pertinent factor identified in Rule 23(b)(3)—"the interest of members of the class in individually controlling the prosecution or defense of separate actions," Fed.R.Civ.P. 23(b)(3)(A)—the direct purchaser plaintiffs assert that "most Class members would be effectively foreclosed from pursuing their claims" if required to pursue them individually. Direct Purchaser Pls.' Mem. at 19. The direct purchaser plaintiffs have, however, submitted no evidence of insufficient individual claims, instead presenting only aggregate estimates of purchases and claims. *See* Leitzinger Rep. [Doc. No. 136] at 38, 49. Moreover, the Schondelmeyer Declaration identifies the direct purchasers as primarily large businesses with presumably large claims: "wholesalers, retail chains with their own warehouses, and managed care organizations with their own warehouses." Schondelmeyer Decl. [Doc. No. 120] ¶ 72. Nevertheless, the inclusion of approximately sixty class members suggests at least some "diversity both in the size of [the] businesses and in the size of their claims." *Cardizem*, 200 F.R.D. at 325. In addition, "the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high," *Amchem*, 521 U.S. at 617, 117 S.Ct. 2231, and individual damages ultimately may not run high given SmithKline's attempt to limit them through consideration of bypass and limited substitution. Given the oft-emphasized importance of private enforcement of federal antitrust laws, *see, e.g., Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. 2224, the Court resolved any uncertainty regarding the size of the direct purchaser plaintiffs' claims in favor of superiority and certification.

The remaining factors described in Rule 23(b)(3) appear to be neutral or to favor certification. The Court is not aware of any other "litigation concerning the controversy already commenced by or against members of the class" which might otherwise create a threat of multiplicity and inconsistent adjudications. Fed.R.Civ.P. 23(b)(3)(B); *see* 7A Wright, Miller & Kane, *supra*, § 1780. The consolidation of several related claims—including those of a generic manufacturer and a proposed class of end payors—before this Court increase the "desirability ... of concentrating the litigation of the claims" of the direct purchasers in this forum. Fed. R.Civ.P. 23(b)(3)(C). Finally, the direct purchaser plaintiffs established that class members were readily identifiable and many had previously communicated with class counsel, suggesting that neither identification nor notice was likely to present "difficulties ... in the management of a class action." Fed. R.Civ.P. 23(b)(3)(D); *see Amchem*, 521 U.S. at 628–29, 117 S.Ct. 2231 (affirming an order directing decertification where an "unselfconscious and amorphous" class of persons exposed to asbestos raised a grave "question whether notice sufficient under the Constitution and Rule 23 could ever be given"). Nor does this action, arising under federal law, present unmanageable choice of law issues. *See id.* at 624, 117 S.Ct. 2231 (reciting the portion of the decertification order that observed that "[d]ifferences in state law ... compound these disparities" between class members); *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir.1996). The Court acknowledged that difficulties might later arise concerning SmithKline's bypass and substitution arguments, but concluded that any damages-related difficulties could be addressed more appropriately as they arose. *Yaffe v. Powers*, 454 F.2d at 1362, 1365 (1st Cir.1972) ("[F]or a court to refuse to certify a class on the basis of speculation as to the merits of the cause or because of vaguely-perceived management problems is counter to the policy which originally led to the rule, and more especially, to its thoughtful revision, and also to discount too much the power of the court to deal with a class suit flexibly, in response to difficulties as they arise."); *see*

also *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140–41 (2d Cir. 2001) (citing *Yaffe* and describing the several "management tools available to a district court to address any individualized damages issues that might arise in a class action").

 The Court accordingly concluded that the direct purchaser plaintiffs established both predominance and superiority as required under Rule 23(b)(3).

## IV. CONCLUSION

For the foregoing reasons, the Direct Purchaser Plaintiffs' Motion for Class Certification [Doc. No. 119] was ALLOWED.