**In re NEXIUM (ESOMEPRAZOLE) ANTITRUST LITIGATION.**

**Civil Action No. 12–md–02409–WGY.**

United States District Court, D. Massachusetts.

Dec. 11, 2013.

Nicole M. Acchione, Trujillo Rodriguez & Richards LLP, Lisa J. Rodriguez, Rodriguez & Richards, LLC, Haddonfield, NJ, Penelope Abdiel, Scott + Scott, Attorneys at Law, LLP, Virginia E. Anello, Douglas & London, P.C., Peter A. Barile, III, Grant & Eisenhofer, P.A., Donald A. Broggi, Joseph P. Guglielmo, Scott & Scott, LLP, Brian D. Brooks, Smith Segura & Raphael LLP, George Farah, Cohen Milstein Sellers & Toll PLLC, Ephraim R. Gerstein, Garwin Gerstein & Fisher LLP, Michael A. London, Douglas & London, Linda P. Nussbaum, Grant & Eisenhofer PA, Joseph Opper, Garwin, Bronzaft, Gerstein & Fisher, J. Douglas Richards, Sharon K. Robertson, Cohen Milstein Sellers & Toll PLLC, Michael Aaron Rose, Hach & Rose, Frank R. Schirripa, Hach Rose Schirripa & Cheverie, LLP, Archana Tamoshunas, Taus, Cebulash & Landau, LLP, New York, NY, Erin Gibson Allen, Moira E. Cain–Mannix, Brian C. Hill, Bernard D. Marcus, Jonathan D. Marcus, James F. Rosenberg, Marcus & Shapira LLP, Pittsburgh, PA, John P. Bjork, David P. Germaine, Vanek Vickers & Masini PC, Justin N. Boley, Bethany R. Turke, Edward A. Wallace, Kenneth A. Wexler, Wexler Wallace LLP, Chicago, IL, Eric L. Bloom, Monica L. Rebuck, Hangley Aronchick Segal Pudlin & Schiller, Harrisburg, PA, Christopher M. Burke, Walter W. Noss, Scott & Scott LLP, San Diego, CA, James E. Cecchi, Lindsey H. Taylor, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., Roseland, NJ, Caitlin G. Coslett, Eric L. Cramer, Daniel C. Simons, Daniel Walker, David F. Sorensen, Nicholas Urban, Berger & Montague PC, Donald W. Myers, Buchanan Ingersoll & Rooney PC, Barry L. Refsin, Hangley, Aronchick, Segal, Pudlin & Schiller Philadelphia, PA, Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Kimberly A. Dougherty, Janet Jenner & Suggs, LLC, Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin,

Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Glen DeValerio, Berman DeValerio, Boston, MA, Douglas R. Plymale, James R. Dugan, II, David B. Franco, The Dugan Law Firm, New Orleans, LA, Donna M. Evans, David S. Nalven, Kristen Johnson Parker, Thomas M. Sobol, Andrew J. Vasicek, Hagens Berman Sobol Shapiro LLP, Cambridge, MA, Daniel C. Girard, Girard Gibbs & DeBartolomeo LLP, Christina C. Sharp, Girard Gibbs LLP, San Francisco, CA, Peter Kohn, Joseph T. Lukens, Faruqi & Faruqi LLP, Jenkintown, PA, Anna T. Neill, Douglas H. Patton, Scott E. Perwin, Lauren C. Ravkind, Kenny Nachwalter PA, Miami, FL, Don Barrett, Barrett Law Office, Lexington, MS, Natalie Finkelman Bennett, Shepherd, Finkelman, Miller & Shah, LLP, Media, PA, Russell A. Chorush, Heim Payne & Chorush LLP, Houston, TX, Anne K. Fornecker, Hilliard & Shadowen LLC, Austin, TX, Jayne A. Goldstein, Pomerantz Grossman Hufford Dahlstrom & Gross, LLP, Weston, FL, Aaron D. Kaufmann, Leonard Carder LLP, Oakland, CA, Christopher Lometti, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Peter S. Pearlman, Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NJ, Brian D. Penny, Goldman Scarlato Karon & Penny PC, Wayne, PA, John D. Radice, Radice Law Firm, PC, Long Beach, NJ, Kevin P. Roddy, Wilentz, Goldman & Spitzer PA, Woodbridge, NJ, Susan C. Segura, Smith Segura & Raphael, LLP, Alexandria, LA, Steve D. Shadowen, Hilliard & Shadowen LLC, Mechanicsburg, PA, for Plaintiffs.

Nicholas W. Allen, William A. Zucker, McCarter & English, LLP, Brian T. Moriarty, Hamilton Brook Smith & Reynolds, P.C., Adam L. Sisitsky, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, Ashley E. Bass, Peter Colwell, Courtney R. Forrest, Jonathan Gimblett, Timothy C. Hester, Thomas A. Isaacson, Andrew D. Lazerow, Enrique D. Longton, Evie Spanos, Einar Stole, Covington & Burling LLP, Jonathan B. Berman, John M. Gore, Kevin D. McDonald, Stephanie L. Resnik, Jones Day, Stanley E. Fisher, Paul B. Gaffney, Benjamin M. Greenblum, John E. Joiner, Dane H. Butswinkas, Jonathan B. Pitt, John E. Schmidtlein, Kannon K. Shanmugam, Adam R. Tarosky, James H. Weingarten, Marcie R. Ziegler, Williams & Connolly LLP, Sarah Choi, Lisa Jose Fales, Danielle R. Foley, Venable LLP, James Douglas, Baldridge Venable LLP, Thea Cohen, Katie Einspanier, Christopher M. Jackson, Rebecca A. Koch, Karen N. Walker, Kirkland & Ellis LLP, Washington, DC, Ajay Kayal, Ellen T. Lowenthal, Andrew J. Miller, Budd Larner PC, Short Hills, NJ, Christopher K. Albert, Hamilton Brook Smith & Reynolds, P.C., Concord, MA, Michael P. Kelly, McCarter & English LLP, Wilmington, DE, Jay P. Lefkowitz, Kirkland & Ellis LLP, New York, NY, Alan H. Pollack, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York, NY, Laurence A. Schoen, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, Leslie F. Su, Minerva Law, P.C., Andover, MA, for Defendants.

Elena Chan, Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY, for Plaintiffs and Interested Party.

Lawrence M. Kraus, Foley & Lardner LLP, Boston, MA, Nicholas S. Napolitan, Morrison & Foerster LLP, San Francisco, CA, for Interested Party.

Thomas E. Peisch, Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Boston, MA, Michael J. Rossi, Clark, Hunt, Ahern & Embry, Cambridge, MA, Robert J. Tucker, BakerHostetler, Columbus, OH, for Intervenor.

### *MEMORANDUM AND ORDER*

YOUNG, District Judge.

## I. INTRODUCTION

This case presents a multidistrict, putative class action against AstraZeneca AB, Aktiebolaget Hassle, and AstraZeneca LP (collectively, "AstraZeneca"), Ranbaxy Pharmaceuticals, Inc., Ranbaxy Inc. and Ranbaxy Laboratories, Ltd. (collectively, "Ranbaxy"); Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (collectively, "Teva"); and Dr. Reddy's Laboratories Ltd. and Dr. Reddy's Laboratories, Inc. (collectively, "Dr. Reddy's") (collectively, with Ranbaxy and Teva, the "Generic Defendants") (collectively, with AstraZeneca, the "Defendants") for alleged violations of federal antitrust laws involving

AstraZeneca's heartburn medication, Nexium. This opinion addresses a motion for class certification of the Direct Purchaser plaintiffs. The putative Direct Purchaser class is comprised of wholesalers and retailers that purchased brand drug Nexium directly from AstraZeneca and that "will purchase generic Nexium directly from one or more of other Generic Defendants." Consolidated Am. Compl. & Demand Jury Trial ("Direct Purchasers Compl."), ¶ 19, ECF No. 131. They move for class certification under Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(3). *Id.* ¶¶ 19–23, 38.

## II. ANALYSIS

The Defendants raise many of the same challenges to the Direct Purchasers' motion for class certification as they did against the End–Payors. *Compare* Defs.' Opp'n Direct Purchasers Class Pls.' Mot. Class Certification ("Defs.' Opp'n"), ECF No. 377, *with* Defs.' Mem. Law Opp'n End–Payor Pls.' Mot. Class Certification ("Defs.' End–Payor Mem."), ECF No. 376. On November 14, 2013, the Court granted the End–Payors class certification. Mem. & Order, ECF No. 519. Noting that the same analysis applies with full force and effect to the Direct Purchaser class, the Court here focuses on those matters germane to the Direct Purchasers.

### A. Rule 23(a)(1): Numerosity of the Class

■ In a motion for class certification, the moving party must establish the four threshold requirements under Rule 23(a). *Wal–Mart Stores, Inc. v. Dukes,* — U.S. ——, 131 S.Ct. 2541, 2548, 180 L.Ed.2d 374 (2011). Unlike their opposition to the End–Payors' motion for class certification, here the Defendants strongly contest whether the Direct Purchaser plaintiffs satisfy the numerosity requirement. *See* Defs.' Opp'n 6–13. Numerosity requires the class to be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a). Courts have generally held that classes exceeding forty plaintiffs are deemed sufficient, although courts within this circuit have certified classes with sizes similar to that present-

ed here. *See, e.g., In re Prograf Antitrust Litig.,* No. 1:11–cv–10344–RWZ, 2013 WL 2395083, at *1 (D.Mass. Apr. 23, 2013) (Zobel, J.) (certifying a class of twenty-five pharmaceutical wholesalers); *In re Citigroup, Inc. Capital Accumulation Plan Litig.,* No. 00cv11912–NG, 2010 WL 9067986, at *8–10 (D.Mass. Jan. 6, 2010) (Gertner, J.), *aff'd,* 652 F.3d 88 (1st Cir.2011) (certifying a subclass of twenty participants in an employee stock compensation program).

### 1. Class Below Forty Members

■ The expert for the named Direct Purchasers, Dr. Raymond Hartman, measures the putative class according to two "but-for" generic entry dates, April 14, 2008 and January 1, 2012, resulting in either thirty-one or twenty-six class members, respectively. Notice Filing Unredacted Copy Decl. Raymond S. Hartman Supp. Certification Class Direct Purchasers Nexium, Ex. 1, Decl. Raymond S. Hartman Supp. Certification Class Direct Purchasers Nexium ("Hartman Decl."), ¶¶ 37, 65, ECF No. 401–1. The Court however, adopts the Defendants' figures of twenty-nine or twenty-four members, which account for the consolidation of two entities with their parent corporations. Decl. Thomas A. Isaacson Supp. Defs.' Opp'n Direct Purchaser Class Pls.' Mot. Class Certification (Dkt. No. 266), Ex. 1, Expert Report Dr. John H. Johnson, IV Direct Purchaser Class Certification, ("Johnson Rpt.") ¶ 11 n. 11, ECF No. 356–1.

While the Defendants point out that this range falls well below the suggested threshold of forty members, Defs.' Opp'n 8, (citing *García–Rubiera v. Calderón,* 570 F.3d 443, 460 (1st Cir.2009) and *In re Relafen Antitrust Litig.,* 218 F.R.D. 337, 342 (D.Mass. 2003), which relied on the suggested number of forty class members to satisfy numerosity), it is clear that district courts have taken a more flexible approach to the numerosity analysis. The named Direct Purchasers cite to cases from this circuit, and to numerous cases from other circuits, to demonstrate the frequency with which courts have certified classes of fewer than forty members. Reply Br. Further Supp. Direct Purchaser Class Pls.' Mot. Class Certification ("Pls.' Reply

Brief"), 4–5 nn. 11–13, ECF No. 395. For example, in a multidistrict generic delay case in this district, Judge Rya Zobel, after a "rigorous analysis" under the requirements of Rule 23(a), certified a class of twenty-five pharmaceutical wholesalers suing as direct purchasers. *In re Prograf Antitrust Litig.,* 2013 WL 2395083, at *1 n. 2. In another generic delay case, a class of thirty-three direct purchasers was certified "[b]ecause of the complexity and sheer volume of discovery in this case and because the 33 direct purchasers are located across the country." *In re Wellbutrin XL Antitrust Litig.,* Civ. Action No. 08–2431, 2011 WL 3563385, at *3 (E.D.Pa. Aug. 11, 2011).

The test for numerosity requires the Court to address the question of whether "joinder of all members is impracticable." Fed. R.Civ.P. 23(a)(1). The reasoning of this Court in a recent case is instructive. This Court, in *Liberty Media Holdings, LLC v. Swarm Sharing Hash File,* 821 F.Supp.2d 444 (D.Mass.2011), held that permissive joinder of thirty-eight defendants was proper under Rule 20. *See id.* at 451–52. The moving plaintiffs in *Liberty Media* met the dual requirements for Rule 20: first, their claims arose from the "same transaction or occurrence," because all defendants were "part of a BitTorrent swarm that infringed upon Liberty Media's rights by collectively downloading and distributing its copyrighted Motion Picture file," *id.* at 451; and second, their copyright infringement claims involved "common questions of law and fact" that were identical against all defendants. *Id.* Even though "certain defendants may later present different factual circumstances to support individual legal defenses, at this stage in the litigation, joinder is proper based on the common questions of law and fact...." *Id.* The Court's joinder analysis in *Liberty Media,* relying on non-numeric factors like "same occurrence" and commonality, provides a comparative line of reasoning to the present question—whether numerosity is met. Acknowledging that the size of the putative Direct Purchasers class alone does not establish a clear case for numerosity, the Court considers non-numeric factors to determine whether joinder of twenty-four or twenty-nine members is impracticable in this present case.

## 2. Subjective Factors in Numerosity Analysis

■ Subjective factors such as the geographic location of proposed class members, the nature of the action, and matters of judicial economy must be taken into account in this inquiry. *See* 5 James Wm. Moore et al., Moore's Federal Practice § 23.22[1][a]-[f] (3d ed. 1999) (listing subjective factors to consider when determining whether a class is sufficiently numerous); *see also Meijer, Inc. v. Warner Chilcott Holdings Co. III,* 246 F.R.D. 293, 306 (D.D.C.2007) ("Significantly, 'the test for impracticability of joinder is not simply a test of the number of class members. When the class is large, numbers alone are dispositive, but when the class is small, factors other than numbers are significant.' ") (quoting *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986)). First, the named Direct Purchasers state that the putative class members are geographically dispersed "throughout the country," and joinder would be "difficult, inconvenient, and costly." Notice Filing Unredacted Copy Direct Purchasers Class Pls.' Mem. Supp. Mot. Class Certification, Ex. 1, Direct Purchasers Class Pls.' Mem. Law Supp. Mot. Class Certification ("Pls.' Mem.") 7, ECF No. 365–1. Second, the Court recognizes that many courts have given favorable treatment to class actions in the "private enforcement of antitrust laws." *Town of New Castle v. Yonkers Contracting Co.,* 131 F.R.D. 38, 41 (S.D.N.Y. 1990) ("Since private enforcement of antitrust laws provides a supplement to governmental enforcement, it is our view that class action treatment of alleged antitrust violations is appropriate and desirable."); *see, e.g., In re Carbon Black Antitrust Litig.,* No. Civ.A. 03–10191–DPW, 2005 WL 102966, at *9 (D.Mass.2005) (Woodlock, J.) (explaining that class certification analysis was conducted "recognizing the interplay between the policy objectives of both the antitrust provisions and of class certification," and that "[c]ourts have noted that class actions are a particularly appropriate mechanism for achieving such enforcement...."); *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 258

(D.D.C.2002) ("Moreover, it has long been recognized that class actions play an important role in the private enforcement of antitrust actions."). The Court adopts these views here. Third, judicial economy would best be served by certifying the Direct Purchaser class, primarily because all putative class members seek damages stemming from the same, identical transactions between AstraZeneca and the Generic Defendants. Despite the Defendants' arguments that modern discovery and litigation practices would lessen the costs of joinder, *see* Defs.' Opp'n 10, and that individual class members are economically capable of bringing individual suits,[1] it seems here that litigating the same exact claims in multiple courts across the country is "impracticable."

The Court thus determines the numerosity requirement to have been sufficiently met under Rule 23(a)(1), and accepts the Defendants' calculations for the class size to be twenty-four or twenty-nine members, depending on the determination of a "but-for" generic entry date.

As the Direct Purchaser plaintiffs have properly met the requirements under Rule 23(a)(2) and (3), commonality and typicality, the Court will move on to address the fourth requirement, adequacy of class representation.

## B. Rule 23(a)(4): Adequacy of Representation

■ Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class," Fed. R.Civ.P. 23(a)(4), and that "the interests of the representative party will not conflict with the interests of any of the class members." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985). Adequacy also requires that class counsel be "qualified, experienced and able to vigorously conduct the proposed litigation." *Id.* at 130.

■ The Defendants do not challenge the competency of class counsel, and the record contains no evidence impugning their qualifications. *See* Linda S. Mullenix, *Taking Adequacy Seriously: The Inadequate Assessment of Adequacy in Litigation and Settlement Classes,* 57 Vand. L.Rev. 1687 (2004). Rather, the Defendants dispute whether assignees of direct purchaser claims can be included in the proposed class and serve as class representatives. Defs.' Opp'n 20. Class representatives, of course, "must be part of the class." *Wal-Mart,* 131 S.Ct. at 2550 (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977)). Specifically, the Defendants argue that two of the five named Direct Purchaser plaintiffs, American Sales Company, LLC ("ASC") and Meijer, Inc. with Meijer Distribution, Inc. (collectively, "Meijer"), are improperly included in the proposed class because "[n]either bought Nexium from AstraZeneca." Defs.' Opp'n 20. To support this claim, the Defendants point out that ASC and Meijer were excluded from the list of direct purchasers in Dr. Hartman's expert report. *Id.; see* Hartman Decl., Attachment D.1, Direct Customer List Scenario 1, D.2, Direct Customer List Scenario 2. This argument is not compelling. This list, as the named Direct Purchasers note, is not a list of plaintiffs with legal standing to sue, but rather is a list of direct purchasers taken from AstraZeneca's sales data. Pls.' Reply Brief 19 n. 68. As stated in the Direct Purchasers' complaint and expert report, ASC and Meijer are both assignees of the claims of direct purchasers that bought Nexium from AstraZeneca within the class period. ASC sues on behalf of itself and on behalf of McKesson Corp., and Meijer sues on behalf of Frank W. Kerr Co. Direct Purchasers Compl. ¶¶ 19–20; Johnson Rpt. ¶ 12. As a result, the Court holds that assignees ASC and Meijer can serve as class representatives.

Ample precedent exists for the proposition that assignees can be adequate class representatives. This Court in *In re Relafen Antitrust Litigation,* involving a generic delay antitrust case, allowed drugstore plaintiffs, who were assignees of the claims of several wholesalers, to sue for overcharge damages.

---

1. The Defendants concede that the median purchase of Nexium by each of the members of the putative Direct Purchaser class exceeded $22,000,000. Defs.' Opp'n 12.

360 F.Supp.2d 166, 187 (D.Mass.2005) ("[T]he drugstore plaintiffs had been expressly assigned the rights of several national wholesalers, undisputed direct purchasers that had opted out of the direct purchaser plaintiffs' class."). More recently, the Second Circuit in *Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.*, rejected a per se rule that assignees cannot serve as adequate class representatives. 502 F.3d 91, 101 (2d Cir.2007) (holding that assignees properly stood before the court "in the shoes of" class members as "assimilated members of the class."). This Court follows its decision in *In re Relafen*, 360 F.Supp.2d 166, as well as numerous other decisions that have allowed for assignees to be included within a proposed class. *Accord In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 102 (E.D.N.Y. 2012) ("[T]here is no rule prohibiting the assignment of class membership.... Ranis's status as an assignee therefore does not prevent it from joining or representing the class."); *In re Wellbutrin Sr Direct Purchaser Antitrust Litig.*, No. 04–5525, 2008 WL 1946848, at *4 (E.D.Pa. May 2, 2008) (noting that the Third Circuit has "long recognized that antitrust claims can be assigned" and that "numerous courts have certified litigation classes in which the named plaintiffs were operating under an assignment."); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 305 (E.D.Mich.2001) (permitting an assignee to "stand in [a direct purchaser's] shoes" for purposes of class certification).

Here, there is no reason to believe the actual assignments are invalid, nor does the Court find any evidence that ASC and Meijer do not share the same interests as the rest of the class (in fact, ASC also sues on behalf of itself as a direct purchaser). Direct Purchasers Compl. ¶ 19. Consistent with the case law of this Court and that of several other jurisdictions, the Direct Purchasers have fulfilled the requirements of Rule 23(a)(4). ASC and Meijer are included in the proposed Direct Purchasers class and may serve as class representatives.

### C. Rule 23(b)(3): Predominance

The named Direct Purchasers seek class certification under Rule 23(b)(3), which permits a class action where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members" and where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The named Direct Purchasers note that predominance has been established in "every antitrust case brought by direct purchasers seeking overcharge damages due to suppressed generic competition," because anticompetitive conduct uniformly deprives direct purchasers of less expensive generics. Pls.' Mem. 14. Countering this assertion, the Defendants argue that there is no common proof of injury and damages because the named Direct Purchasers' economic model fails to account for variations in price and generic switch rate and improperly relies on averages. Defs.' Opp'n 15–16.

The key inquiry is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The named Direct Purchasers' burden under this Rule and its recent interpretation in *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 1430, 185 L.Ed.2d 515 (2013), is simply to present a common damages model, limited to and reflecting only the theories of liability accepted by the Court.

This Court must subject the proffered arguments and expert reports to rigorous scrutiny to determine whether the named Direct Purchasers present a "reasonable, judicially recognized methodology for calculating damages and [show] that the data needed to make these calculations is available and common to the class." *In re Neurontin Antitrust Litig.*, Nos. 02–1830(FSH), 2011 WL 286118, at *10 (D.N.J. Jan. 25, 2011). Arguments pertaining to specific damages allocation need not be entertained at this class certification stage; they are properly addressed upon the jury determination of liability.

As discussed in its End–Payors' class certification analysis, this Court follows the legal standards outlined in *Wal–Mart*, 131 S.Ct. at 2541, and *Comcast*, 133 S.Ct. at 1426, in its

"rigorous analysis" of the predominance of questions common to the class. *Wal–Mart*, 131 S.Ct. at 2551. Rule 23 certification ought not turn into a "full-blown merits analysis." *In re: Cathode Ray Tube Antitrust Litig.*, No. C–07–5944–SC, 2013 WL 5391159, at *5 (N.D.Cal. Sept. 19, 2013). The Court's conclusions here are not evidentiary "findings" of fact, but are merely preliminary conclusions that here allows this litigation to move beyond the class certification stage. *See* Mem. & Order 18 ("Fact-finding emerges only after full evidentiary exposition, including searching cross-examination, none of which has taken place here."). Upon review of the parties' filings and expert reports, the Court concludes that the named Direct Purchasers have sufficiently demonstrated antitrust impact and damages common to the class.

### 1. Common Proof of Antitrust Impact

■ Like the End–Payor plaintiffs, the named Direct Purchasers allege the Defendants "engineered an overarching scheme" of utilizing reverse payment agreements to delay generic entry, resulting in antitrust impact and injury to Nexium purchasers. Direct Purchasers Compl. ¶ 5; Corrected Consol. Am. Class Action Compl. & Demand Jury Trial ("End–Payors' Compl.") ¶ 5, ECF No. 114. This Court agrees that each member of the putative Direct Purchaser class alleges the same claims arising from a "unified course of anticompetitive conduct;" namely, AstraZeneca's lawsuits against its generic rivals and the resulting reverse payment agreements. Pls.' Mem. 15–16. Here, the theory of liability for antitrust violations is straightforward, but establishing proof of common impact and damages requires a closer look to determine that all class members suffered common impact as a result of the Defendants' actions.

■ The Court's standard of review, as outlined in the End–Payors' class certification analysis, *see* Mem. & Order 26–27, requires that the moving party demonstrate that "all class members were victims," *Wal–Mart*, 131 S.Ct. at 2552, n. 7, but the party need not demonstrate the "precise amount of damages incurred by each class member." *In re Rail Freight Fuel Surcharge Antitrust*

*Litig.–MDL No. 1869*, 725 F.3d 244, 252 (D.C.Cir.2013). As the First Circuit has acknowledged, the plaintiffs' theory

> must include some means of determining that each member of the class was in fact injured, even if the amount of each individual injury could be determined in a separate proceeding. Predominance is not defeated by individual damages questions as long as liability is still subject to common proof. This is because the class action can be limited to the question of liability, leaving damages for later individualized determinations.

*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir.2008) (internal citations omitted).

The Direct Purchasers present common proof of antitrust impact in the form of overcharges. The Supreme Court has "long recognized [overcharges] as the principal measure of damages for plaintiffs injured as customers." *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 344 (D.Mass.2003); *see Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) (accepting overcharges as the basis for calculating damages). Citing to findings from Dr. Hartman's expert report, the Direct Purchasers list three forms of antitrust impact they intend to prove at trial: (1) Defendants' conduct had a market-wide effect, artificially inflating esomeprazole prices; (2) all or nearly all class members would have purchased generics at a lower price; and (3) all or nearly all class members would have purchased brand Nexium at a lower price. Pls.' Mem. 16–17.

#### a. Market Effect: Brand Erosion

"Generics are priced substantially below their branded counterparts and quickly capture sales from the brand," *id.* at 17, and AstraZeneca, in its own internal forecasts, expected generic Nexium to have the same market effect. Hartman Decl. ¶ 32. AstraZeneca and the Generic Defendants are well-versed in this market phenomenon, as demonstrated by the Generic Defendants' own "brand erosion" predictions and by AstraZeneca's internal analyses and emails, estimating brand erosion of 90 percent within three

months of generic entry. *Id.* The Generic Defendants predict the minimum first-year generic market share would fall within a range from 60 percent—Ranbaxy, 85 percent—Dr. Reddy's, to 90 percent—Teva. *Id.* Ranbaxy, for example, estimates 50 percent price erosion within a year and 95 percent erosion within two to six years. *Id.* Dr. Hartman repeatedly emphasizes that his own yardstick predictions are more "conservative" than those of the Defendants, although the Court is unsure whether this is a statement addressing the damages model as a whole or if Dr. Hartman is referring to his brand erosion calculations. *Id.* ("Compared to Teva, I use more conservative generic market share yardsticks and more conservative brand price yardsticks."). Whoever presents the more conservative yardstick measurement, it is indisputable that the Defendants, and specifically AstraZeneca, recognized that entry of an authorized generic would result in rapid brand erosion and in the price decline of both brand and generic Nexium. The next step turns on whether all putative class members suffered overcharge damages and whether these damages can be demonstrated with common proof of impact.

### b. Generic Bypass Effect

Dr. Hartman calculates two sets of overcharge damages: $25,600,000,000 for a generic entry date in April 2008 and $8,200,000,000 for a generic entry date in January 2012. *Id.* at ¶¶ 62–66. These damages were calculated based on "yardstick" percentages, derived from sales data for Prevacid and its generic, lansoprazole, a similar proton pump inhibitor in the same category as Nexium. *Id.* at ¶ 61 (incorporating National Sales Perspective data from IMS Health, a vendor of pharmaceutical industry data). Overcharges were measured based on the number of units of Nexium purchased by direct purchasers during the class period, "regardless of whether some of those units would not have been purchased by those wholesalers during a period of earlier generic entry" due to "generic bypass." *Id.* at ¶ 55.

Generic bypass—where generic manufacturers sell directly to end-purchasers and retailers, bypassing the wholesale level—was addressed by this Court in *In re Relafen*

*Antitrust Litig.*, 346 F.Supp.2d 349, 368–69 (D.Mass.2004), which held that reducing damages to plaintiff wholesalers under a bypass defense is inconsistent with *Hanover Shoe*, 392 U.S. at 489, 88 S.Ct. 2224. In *Hanover Shoe*, 392 U.S. at 489, 88 S.Ct. 2224 the Supreme Court rejected a "passing on" defense which, if allowed, would prevent plaintiffs from recovering damages based upon the amount of overcharges passed through to final payors. *Id.* ("We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows."); *see also In re Relafen,* 346 F.Supp.2d 349, 369 ("Moreover, as *Illinois Brick* makes clear, *Hanover Shoe* permits a direct purchaser to recover the 'full amount of the overcharge,' *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 733, 745–46, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), even if he is otherwise benefited, *Sports Racing Servs., Inc. v. Sports Car Club of Am.,* Inc., 131 F.3d 874, 885 (10th Cir.1997).").

Dr. Hartman states he was advised by the representative plaintiffs to assume the Court will rule that overcharge calculations need not account for generic bypass, although he is able to incorporate generic bypass into his model. Hartman Decl. ¶ 57. The Defendants respond by pointing out that Dr. Hartman "offered no methodology to account for the varying extent of generic bypass .... that would not require analysis for each individual direct purchaser." Johnson Rpt. ¶ 43.

The Court draws the following conclusions. First, the issue of generic bypass primarily affects the measure of damages, a matter exclusively reserved to jury determination at trial. Second, this Court adheres to its ruling in *In re Relafen* that generic bypass cannot preclude recovery and that plaintiffs only need a "viable method" for demonstrating damages common to the class. *In re Neurontin,* 2011 WL 286118, at *10; *see also In re Wellbutrin XL Antitrust Litig.,* 2011 WL 3563385, at *16; *In re K–Dur Antitrust Litig.,* No. 01–1652(JAG), 2008 WL 2699390, at *15 (D.N.J. Apr. 14, 2008) ("Moreover, because Defendants concede that 45 of the proposed Class members purchased *some*

amount of generic K–Dur, they cannot contend that these Class members were entirely bypassed.... Defendants' arguments regarding the effects of generic bypass relate to the quantum of damages, rather than the fact of injury."), *aff'd In re K–Dur Antitrust Litig.*, 686 F.3d 197, 223 (3d Cir.2012), *vacated on other grounds sub nom., Upsher– Smith Labs., Inc. v. Louisiana Wholesale Drug Co.,* —— U.S. ——, 133 S.Ct. 2849, —— L.Ed.2d —— (2013) (mem.), *reinstated sub nom., In re K–Dur Antitrust Litig.*, Nos. 10– 2077, 10–2078, 10–2078, 10–4571, 2013 WL 5180857 (3d Cir. Sept. 9, 2013). Finally, it is clear that proving the actual effects of generic bypass is not a burden that the named Direct Purchasers bear in demonstrating predominance of common issues of law or fact under Rule 23(b)(3). At this stage, like questions of individualized damage, generic bypass cannot preclude certification of the plaintiff class.

### c. Variations in Sales Price and Use of Averages

The Defendants challenge both the assertion of common antitrust impact and Dr. Hartman's methodologies by arguing that "fact of injury" requires individual inquiry into each class member's "purchase strategies, volumes, and net prices." Defs.' Opp'n 14 (stating that plaintiffs' common proof "must include some means of determining that each member of the class was in fact injured.") (quoting *In re New Motor Vehicles*, 522 F.3d at 28). Specifically, the Defendants point out two issues with the named Direct Purchasers' model: (1) the "enormous" variation in the sales price of Nexium; and (2) Dr. Hartman's use of averages in calculating net prices and rates of generic switching. Defs.' Opp'n 14–15.

The average net price paid for each brand Nexium pill, during the proffered class period of August 27, 2008 to May 30, 2013, is calculated to be $4.42, with the highest average net price peaking at $5.41 per pill and the lowest average prices at $0.43 and $1.94 per pill, paid by DMS Pharmaceutical Group Inc. and Good Samaritan Hospital & Health, respectively. Johnson Rpt. ¶ 7, Ex. 6, Average Net Prices Nexium Direct Purchasers During Class Period. The Defendants use

this range to argue that the two class members paying $0.43 and $1.94 per pill paid "far below the but-for generic price[s]" of "roughly $1.00–3.00/pill" and were thereby uninjured, defeating the predominance requirement. Defs.' Opp'n 14. The Defendants' expert, Dr. Johnson, further criticizes Dr. Hartman's damages model for failing to account for the widely varying deductions and discounts received by direct purchasers from AstraZeneca. Johnson Rpt. ¶ 20. Thus, failing to account for chargebacks, rebates, and discounts "will directly cause actual net prices paid by direct purchasers to diverge from the average price used by Dr. Hartman." Johnson Rpt. ¶ 23 (listing discounts ranging from 29 percent to 90 percent).

Moreover, the Defendants argue that averages are "inadequate" when "there is evidence that individual class members do not conform to the average." Defs.' Opp'n 16 (citing *In re New Motor Vehicles*, 522 F.3d at 28). In light of Dr. Johnson's finding that four putative class members made 94 percent of the total purchases of brand Nexium, the Defendants argue that the use of averages "unacceptably masks the significant variation" among class members. Defs.' Opp'n 16 (quoting *Reed v. Advocate Health Care*, 268 F.R.D. 573, 592 (N.D.Ill.2009)). Dr. Johnson also points out that one putative class member, Good Samaritan Hospital & Health, made only a single purchase of 1,000 brand Nexium pills—for less than half the average Nexium brand price at the time—raising doubt as to whether Good Samaritan would have bought generic Nexium in a but-for world, "at a time when Dr. Hartman's but-for generic prices are not clearly lower than the price Good Samaritan actually paid for brand Nexium." Johnson Rpt. ¶ 37.

Upon consideration of the parties' expert reports and theories on brand erosion and generic bypass, this Court concludes that the Direct Purchasers are able to present a common impact theory at trial, and that at this stage of litigation, a showing of common impact has been satisfied. *See supra* section II.C.1.a. The Defendants' focus on the variations in purchase price among the putative class members directly challenges the Direct Purchasers' damages model, but it does not

weaken their assertion of common impact. First, as discussed in the Court's End–Payor class analysis, antitrust *impact* "occurs the moment the purchaser incurs an overcharge" and is conceptually different from the task of assessing antitrust damages. Mem. & Order 26. Second, individualized damages are reserved for determination at trial. *See supra* section II.C.1.b.

As to the use of averages, *Wal–Mart* may have struck down the use of a "sample set" measurement, 131 S.Ct. at 2544, 2561, but the Supreme Court did not bar the use of averages or aggregate damages measurements in class certification. The sample set in that case applied to a class of "some 1.5 million female employees" of Wal–Mart, *id.* at 2544—a much different factual scenario than the one presented by the identifiable class members in the present case. Adhering to the Supreme Court's directive, this Court rejects the use of "Trial by Formula" in crafting a class and concludes that the Direct Purchasers' proffered methodology, utilizing both averages and "but-for" calculations, is both reasonable and judicially recognized.

 The Court recognizes that uninjured direct purchasers may be included within the sweep of the proposed class, but emphasizes that the presence of uninjured class members is not fatal to class certification. *See* Mem. & Order 27 ("Several courts, however, have held that at this class certification stage of litigation, the inclusion of uninjured class members is not fatal to class certification."). Class certification does not turn on whether a moving party has addressed all possible variations and nuances in its damages calculations. The Defendants, in their attempt to undercut Dr. Hartman's damages model, rely too heavily on pointing out missing factors in the damages model, arguing that Dr. Hartman failed to account for differences among types of customers, buying power of individual wholesalers, regional preferences for Nexium, and individual purchase price. Johnson Rpt. ¶ 20–24. At this stage of litigation, the Court recognizes that while it must address "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Wal–Mart*, 131 S.Ct. at 2552

(quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)), it should not engage in a "full-blown merits analysis," *In re: Cathode Ray Tube*, 2013 WL 5391159, at *5. As in *In re: Cathode Ray Tube*, it appears the Defendants here are "trying to push ... the Court toward a full-blown merits analysis, which is forbidden and unnecessary at this point." *Id.* (internal citation omitted).

### 2. Common Proof of Damages

 Finally, the Direct Purchasers address common proof of damages under the rubric of *Comcast*, 133 S.Ct. at 1433 (vacating class certification which failed properly to propose proof of damages "capable of measurement on a classwide basis."). In both *Comcast* and *Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, —— U.S. ——, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013), the Supreme Court held that predominance fails when "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *See Comcast*, 133 S.Ct. at 1433; *Amgen*, 133 S.Ct. at 1196. As discussed in this Court's End–Payors' analysis however, *see* Mem. & Order 32, this rule does not preclude the use of aggregate damages calculations. They are "implied by the very existence of the class action mechanism itself." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009). "Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages...." *Id.* (quoting 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10.5, at 483–86 (4th ed. 2002)).

The Direct Purchasers present two preliminary damages calculations based on the April 2008 and January 2012 but-for generic entry dates, with damages continuing to accrue to class members. Pls.' Mem. 19. First, they argue that Dr. Hartman's "yardstick" methodology has been endorsed by the First Circuit, and district courts within this circuit, in numerous delayed-generic cases. *Id.* at 19 n. 67; Pls.' Reply Brief 15 n. 56 (citing *In re Pharm.*, 582 F.3d at 197, *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 248 F.R.D. 363, 371

(D.Mass.2008) (Saris, J.), *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F.Supp.2d 249, 256 (D.N.H.2007)).

The Defendants challenge this assertion by arguing that "common issues . . . do not predominate when individualized inquiries are necessary" to measure varying damages among the class. Defs.' Opp'n 17. Similar to their criticisms of the End–Payors' expert methodology, *see* Defs.' End–Payor Mem. 13–14, the Defendants point out that Dr. Hartman fails to account for actual brand prices, but-for generic prices, purchases by brand loyalists, and generic and other-drug conversion rates. Defs.' Opp'n 17–18. For example, individual discounts to direct purchasers "ranged from less than 5% to more than 90%," and the generic conversion rates of Dr. Hartman's benchmark drug Prevacid ranged from "roughly 0% to 90%, depending upon the category of trade." Defs.' Opp'n 17–18. Less persuasive here are the Defendants' arguments pointing to the potential inaccuracies in the but-for pricing of Nexium due to factors like brand-loyal purchases and conversion to other drugs. *Id.* These variations, the Defendants argue, are ignored by the use of averages calculations, *see id.* at 18, and without individualized inquiries, will result in the unlawful recovery of damages by uninjured direct purchasers.

The Court acknowledges that variation in actual price paid among the direct purchasers may preclude some class members from recovery if it is shown that various rebates, discounts, or buying practices did not result in net positive damages. At this stage, however, the Court looks to see whether the Direct Purchasers are able to show common damages with their proffered methodology. As with the End–Payors, the Direct Purchasers here advance a single, class-wide theory of harm: Defendants' unlawful conduct delayed the entry of lower-priced generic Nexium, *see* Direct Purchasers Compl. ¶¶ 10–12, clearly differentiating this case from the facts in *Comcast*, which rejected a damages model because it failed solely to incorporate the court's accepted theory of liability. 133 S.Ct. at 1430. With respect to actual damages calculations, the Court notes that, in contrast with the End–Payors, here precise

sales data for the purchases of brand Nexium are readily available for all direct purchasers. *See* Johnson Rpt. Ex. 2, Net Sales Nexium AstraZeneca Direct Purchasers. Echoing the suggestion made in the Court's End–Payor class certification opinion, *see* Mem. & Order 37, having this sales data will prove useful if a jury is able to establish a baseline supracompetitive overcharge, from which individual class members may calculate their recovery. *Id.* ("Perhaps, if liability is established, competent evidence may lead to a jury finding of the average amount of the supracompetitive overcharge on a capitation basis. It may then be appropriate to use this average as a baseline for further proceedings."); *see* Tobias Barrington Wolff, *Managerial Judging and Substantive Law*, 90 Wash. U.L.Rev. 1027 (2013).

Here, two sets of common damages are calculated and presented under a reasonable and judicially acceptable methodology, based upon existing sales data by the identifiable direct purchasers and benchmarked against a similar drug, Prevacid, and its generic. The Direct Purchasers have thus met the requirement of proving common damages under Rule 23(b)(3).

### 3. Superiority

Lastly, the Direct Purchasers address the second prong of Rule 23(b)(3) and contend that class action treatment is superior to other methods to achieve "economies of time, effort, and expense." Pls.' Mem. 20 (quoting *In re Relafen*, 218 F.R.D. at 346). They argue in favor of the superiority of the class action device, based on the fact that, like the End–Payors in this case, the Direct Purchasers bring their antitrust allegations under a consolidated theory of liability, targeting three specific reverse payment agreements with a single entity, AstraZeneca. Because this case is "no more complicated than *Relafen*," the Direct Purchasers assert that class action treatment would be a superior method of adjudicating their claims. *Id.* at 20 n. 71.

The Defendants' counterarguments are powerful: they first point out that class members are economically well-suited for individual suits because of the "nearly $1 billion" in damages claimed per plaintiff. Defs.'

Opp'n 19. Further, the Defendants note that class claims are concentrated in three of the largest class members (who account for 87.7 percent of all class purchasers), and that these members have no need for class action treatment to resolve their claims. *Id.* at 19–20.

This is a close call. Even so, considering the complex nature of this litigation, the fact that complete joinder of the Direct Purchaser class is impracticable, and the "desirability" of concentrating litigation in this single forum, Fed.R.Civ.P. 23(b)(3), the Court here concludes that class action treatment is superior to other methods for "fairly and efficiently adjudicating the controversy." *Id.*

## III. CONCLUSION

Accordingly, this Court GRANTS the Direct Purchasers' Motion for Class Certification under Federal Rule of Civil Procedure 23(a) and (b)(3). The Court certifies the following class: All persons or entities in the United States, including U.S. territories, who purchased branded Nexium directly from AstraZeneca at any time during the period August 27, 2008, through the date the Court enters an order certifying the class (the "Class"). Excluded from the Class are the Defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.[2]

**SO ORDERED.**

---

**2.** Pursuant to the Court's order denying AstraZeneca and Ranbaxy's motion for partial summary judgment, the Direct Purchasers' claims, relating to Ranbaxy's alleged exclusion from the market as a result of the AstraZeneca–Ranbaxy settlement agreement, are not yet time-barred under the four-year federal statute of limitations. Order, ECF No. 546.